606 F.2d 259
 CA 79-3723 Mary I. WALSH, Executrix of the Estate of Charles
P. Walsh, Deceased, Plaintiff-Appellee,
v.
ZUISEI KAIUN K. K., a foreign corp., etc., et al.,
Defendants-Appellants.
and
Puget Sound Pilots et al., Additional Party Defendants.
Mary I. WALSH, Executrix of the Estate of Charles P. Walsh,
Deceased, Plaintiff-Cross Appellant,
v.
ZUISEI KAIUN K. K., a foreign corp., etc., et al.,
Defendants-Cross Appellees,
and
Puget Sound Pilots et al., Additional Party Defendants.
 Nos. 76-3424, 76-3444.
 United States Court of Appeals,
Ninth Circuit.
 Oct. 9, 1979.
 
 Theodore A. Le Gros of Howard, Le Gros, Buchanan & Paul, Seattle, Wash., for Zuiser Kaiun.
 H.J. Merrick, Merrick, Hofstedt & Lindsey, Seattle, Wash., for Puget Sound Pilots.
 Milton H. Soriano, Soriano & Soriano, Seattle, Wash., for Walsh.
 Appeal from the United States District Court for the Western District of Washington.
 Before CHAMBERS and HUFSTEDLER, Circuit Judges, and RENFREW,* District Judge.
 CHAMBERS, Circuit Judge:
 
 
 1
 This appeal and cross-appeal are from the judgment of the district court, sitting in admiralty, in a wrongful death case arising out of the drowning of Charles P. Walsh, a Puget Sound pilot. Walsh fell into the water while attempting to transfer from the vessel he was piloting, the RHEIN MARU, to a pilot launch in the Strait of Juan de Fuca, as the vessel was approaching Port Angeles, Washington.
 
 
 2
 The pilot descended ladders that had been placed on the port, or windward, side of the vessel, and he waited at the lower end of the rope ladder as the pilot launch maneuvered into position to receive him. The operator of the pilot launch, a man named Nicholson, had to contend with the motion caused by his own boat, by the vessel (whose engines were stopped but which was moving forward by momentum), and by swells of two to three feet. Moreover, the construction of the vessel and the manner in which the ladders were rigged and placed did not permit him to nestle in against the vessel for added stability. As Nicholson was maneuvering his boat, he had only a fleeting glance of the pilot's lower body on the ladder. It was dark and he had an obstructed view of the quarterdeck area in back of his wheelhouse where the pilot was to land. He did not see the pilot attempt to jump the two to three feet distance to the quarterdeck, lose his balance, and fall into the water. When the pilot did not arrive, Nicholson pulled the launch away from the vessel to take a better look. He saw a member of the RHEIN MARU's crew "casually" pulling up the Jacob's ladder on which the pilot had been standing and concluded that the pilot had changed his mind and decided to attempt to transfer from the starboard, or lee, side of the vessel. Nicholson proceeded to the starboard side of the vessel where, for the first time, he became aware of the accident. He immediately notified the Coast Guard and returned to search for the pilot.
 
 
 3
 The water in this area on the night in question was 42 o and the pilot could have survived only three to four minutes. By the time he was found, he had been in the water considerably longer and was dead. Because the critical period was so short, the RHEIN MARU could not have rescued him as it would have taken too long for it to turn around or to lower a boat. The district court found, and the evidence supports the finding, that the pilot could only have been rescued alive by the action of the pilot launch.
 
 
 4
 The evidence led the district court to conclude that the owners of the RHEIN MARU owed the pilot a duty to exert a reasonable effort to rescue him and they had been negligent in that effort because of the failure to notify the pilot boat of the accident either by voice radio or by sending a member of the crew down the ladder to attract Nicholson's attention. The district court also concluded that the pilot launch was unseaworthy because of the manner of its construction, which obscured the operator's view of the quarterdeck area where the pilot was to be received. Finally, the district court concluded that the decedent was himself negligent for failing to wear a life jacket, for instructing the pilot launch to receive him on the windward side of the vessel, and for instructing that the ladders be placed and rigged as they were.
 
 
 5
 Damages were awarded under the doctrine of comparative negligence. The fault of the pilot was set at one-third and the damages reduced proportionately. The fault of the pilot boat was also set at one-third. The damages were reduced another one-third, on the ground that the decedent was a member of the pilots' association that owned the boat, and accordingly there was no right of recovery against the association. Judgment for one-third of the total damages was rendered against the owners of the RHEIN MARU and the court concluded that they had no right to indemnification from the pilots' association. The owners and the plaintiff have taken appeals. We will address the issues raised by the owners first.
 
 
 6
 The complaint makes no allegations of district court jurisdiction based on statute. It appears to be framed as one for wrongful death under general admiralty law. Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970), created a nonstatutory remedy for wrongful death arising from the violation of maritime duties, in an attempt to permit uniform relief where it had theretofore been either denied or restricted.
 
 
 7
 The owners of the RHEIN MARU ask us to hold that they could not be liable for negligence as there was no duty on their part to rescue the decedent, particularly as there was no finding of any negligence on their part leading to the decedent's fall into the water. They argue that he was a compulsory pilot and not a "seaman" in the classical sense of someone under contract to the ship as a crewman or officer. Cf. Magnolia Towing Co. v. Pace,378 F.2d 12 (5th Cir. 1967), a Jones Act (46 U.S.C. § 688) case, where the pilot was employed directly by the defendant tugboat and worked steadily for the tugboat. A "seaman" has traditionally been entitled to rescue as it is implied in his employment contract that the ship will "use every reasonable means to save the life of a human being who has no other source of help." Harris v. Pennsylvania R. R. Co., 50 F.2d 866 (4th Cir. 1931).
 
 
 8
 Moragne does not address this precise issue, but we have no hesitation in holding that the pilot in this case, even a compulsory pilot, was entitled to the same duty of rescue as a "seaman", using the Harris standard. This is one of the "subsidiary issues" that the Moragne court left to be decided as they arose. 398 U.S. at 408, 90 S.Ct. 1772. As subsidiary issues have arisen, a pattern is developing of looking to the Death on the High Seas Act (46 U.S.C. § 761 et seq.) for guidance. In Mobil Oil Corp. v. Higginbotham,436 U.S. 618, 624, 98 S.Ct. 2010, 2014-2015, 56 L.Ed.2d 581 (1978), in discussing damage and limitations issues in a Moragne -type action, the Court stated:
 
 
 9
 "As Moragne itself implied, DOHSA should be the courts' primary guide as they refine the nonstatutory death remedy, both because of the interest in uniformity and because Congress' considered judgment has great force in its own right."
 
 
 10
 The Death on the High Seas Act extends its remedy not to a "seaman" but to a "person" who suffers death on the high seas. Had this compulsory pilot's death occurred on the high seas, he would have been considered within the ambit of the statute. Moreover, again ruling on a damage issue, the Court in Sea-Land Services, Inc. v. Gaudet, 414 U.S. 573, 588, 94 S.Ct. 806, 816, 39 L.Ed.2d 9 (1974), extended relief to the representative of the decedent beyond the relief afforded by the Death on the High Seas Act because of the "humanitarian policy of the maritime law to show 'special solicitude' for those who are injured within its jurisdiction." Guided by the Death on the High Seas Act and by the humanitarian rationale of Gaudet, we conclude that the owners owed the decedent a duty of rescue, even though there was no negligence on their part for the accident that created the need for the rescue.
 
 
 11
 The next issue is whether that duty was breached in this case. The district court found that the failure of the vessel to contact the pilot launch by voice radio or by sending someone down the ladder to attract Nicholson's attention, were proximate causes of the pilot's death. The critical time during which the decedent might have been saved was very short probably not more than three or four minutes. There was some evidence that crewmen aboard the vessel shouted, waved their arms, sounded the ship's bell, and may have thrown out a life-preserver. Nicholson testified that he heard nothing over the noise of the launch's engine and, in the darkness of the night in question, he saw no one waving arms or otherwise attempting to attract his attention until he pulled up on the other side of the vessel.
 
 
 12
 When there is a total failure to attempt rescue, the plaintiff need not prove that the drowning person could have been saved. Gardner v. National Bulk Carriers, Inc., 310 F.2d 284 (4th Cir. 1962); Abbott v. United States Lines, Inc., 512 F.2d 118, 121 (4th Cir. 1975). Even if we view this case as one where rescue was attempted, the plaintiff need only prove that the negligence of the owners played "any part, however small" in the decedent's death. See Rogers v. Missouri Pacific Railroad Co., 352 U.S. 500, 508, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957).
 
 
 13
 The district court's finding of negligence will not be overturned unless clearly erroneous. McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954); Pacific Tow Boat Co. v. States Marine Corp. of Delaware, 276 F.2d 745, 752 (9th Cir. 1960); Rule 52(a), F.R.Civ.P. Under the McAllister test, we do not overturn a district judge's findings unless we are "left with the definite and firm conviction that a mistake has been committed." We have no such conviction here; on this record we find nothing approaching clear error in the district judge's findings of the owners' breach of their duty of rescue.
 
 
 14
 The owners argue that the finding of a breach of their duty is incompatible with another finding that after the pilot launch had pulled away from the ladder. "Personnel on the RHEIN MARU then reasonably believed that the operator of the launch was aware of the emergency and was maneuvering to rescue the pilot." We do not see this finding as inconsistent with imposing liability on the owners for not making certain, in this case of life or death, that the launch was actually aware of the accident. We will not disturb the district judge's implicit finding that between the time the pilot fell in the water and the time the launch began to proceed to the starboard side, a radio message could have been sent or a crew member could have descended the ladder to attract Nicholson's attention.
 
 
 15
 The owners of the RHEIN MARU argue that they are entitled to indemnification from the pilots' association under the rule of Ryan Stevedoring Co., Inc. v. Pan-Atlantic Steamship Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). Ryan, and most of the cases following it, deal with the indemnification liability of an independent contractor who provides employees to perform some of the ship's operations, usually stevedoring operations. The courts imply a warranty of workmanlike service from the independent contractor to the ship owner, i. e. a warranty that the services will be performed in a reasonably safe manner. If one of those employees is injured and obtains a judgment against the ship owner, the ship owner may look to the independent contractor for indemnification.
 
 
 16
 We have difficulty finding an agreement between the association and the ship owners out of which such a warranty might arise. It does not arise out of any agreement by the association to supply a pilot of the use of this vessel. The district judge found as fact that the pilot was not an employee of the association and that the association "neither exercised nor had the right to exercise any control or supervision over the manner in which" he performed his services. The record supports these findings.
 
 
 17
 Similarly, we have difficulty finding any agreement by the association (as owner of the unseaworthy pilot launch) to provide launch services to the ship owners. Absent an agreement, there can be no warranty of workmanlike service. The only evidence to which the ship owners point is the testimony that the pilotage fees were paid to the association, where common expenses of the various pilots were deducted and the remainder apportioned to the members. The record demonstrates little more than an arrangement whereby an association of pilots provided launch services for the members' benefit as they performed Their independent contractor agreements with the vessels they piloted.
 
 
 18
 Finally, the district judge specifically held that the liability of the ship owners was for their own negligence and "not by reason of any unseaworthiness of the pilot launch PILOT" and therefore the owners were not entitled to indemnification. The ship owners have provided no satisfactory support for their argument that the district judge erred in making this conclusion. The owners cannot shift their one-third liability to the association on the basis of this record, and it is this record on which we must proceed.*
 
 
 19
 The plaintiff's other arguments require little discussion. She contends that there can be no contributory negligence in rescue cases and thus it was improper to reduce the damage award by the one-third share attributed to the pilot's negligence. The argument is misdirected. While contributory negligence is not a defense in admiralty death cases, it does serve to reduce the amount of recovery under the doctrine of comparative negligence. This is well-established in admiralty law. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94 fn., 66 S.Ct. 872, 90 L.Ed. 1099 (1946); Socony-Vacuum Oil Co. v. Smith, 305 U.S. 424, 429, 59 S.Ct. 262, 83 L.Ed. 265 (1939).
 
 
 20
 Finally, plaintiff argues that she should not have been denied her recovery from the pilots' association, for its one-third liability arising out of the unseaworthiness of its pilot launch. The district judge found that the pilots' association was either a partnership or an unincorporated association. The record supports this finding; there is no evidence that it is a corporation. The district judge held that plaintiff had no cause of action as against the association because any unseaworthiness of the pilot launch must be imputed to the decedent who was an active member of the association.
 
 
 21
 The rights of a member against a partnership or unincorporated association vary depending on the law of the State in which the association is formed and is operating. The traditional view is that expressed by the district judge that the unseaworthiness of the launch is imputed to the member of the association. This is the law of Washington. Carr v. Northern Pacific Beneficial Ass'n, 128 Wash. 40, 221 P. 979 (1924). Even those courts that are adopting a more liberal rule look to the nature and extent of the member's ability to affect policy within the association. See e. g. White v. Cox, 17 Cal.App.3d 824, 95 Cal.Rptr. 259 (1971). Without deciding whether the traditional or the more liberal approach should be applied in Moragne -type death actions, we hold merely that under either rule the decedent in this case had that amount of control that his negligence must be imputed to the association. The district court's findings are specific. He was a member of the association from 1959 until his death. He had a "voice in the operation of the association equal to that of any other member," and he had served at least one term as a trustee of the association. He had been on the pilot launch hundreds of times, using it to board or debark from vessels he was piloting, and he "had not criticized the design or construction of the pilot launch PILOT despite his knowledge of its restricted visibility from the wheelhouse" the condition that made it unseaworthy.
 
 
 22
 Affirmed.
 
 
 
 *
 The Honorable Charles B. Renfrew, United States District Judge for the Northern District of California, sitting by designation
 
 
 *
 As a result, we need not consider the possible problem raised by the owners' asserted failure to serve any of the individuals comprising the members, trustees, or officers of the association